# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

FILED BY _SP_ D.C.

05 APR 21 PM 1: 02

ROBERT R. DI TROLIO
CLERK OF U.S. DIST. CT.
W.D. OF TN.-JACKSON

| | | |
|---|---|---|
| CARL EDWARD FLAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 03-1240-T/An |
| | ) | |
| CECO DOOR PRODUCTS a/k/a | ) | |
| THE ASSA ABLOY GROUP, | ) | |
| | ) | |
| Defendant. | ) | |

---

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

The plaintiff, Carl Edward Flake, filed this action on September 12, 2003, against his former employer, Ceco Door Products a/k/a Assa Abloy Group, pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Plaintiff alleges that he was terminated from his employment in violation of these statutes. On October 28, 2004, defendant filed a motion for summary judgment. After receiving two extensions of time to respond, plaintiff's response was due on December 10, 2004. However, no response was filed by that deadline.

Before the Court could issue a ruling on the defendant's motion for summary judgment, the parties filed a joint motion for a status conference on January 12, 2005, acknowledging that there had been no response to the summary judgment motion and

This document entered on the docket sheet in compliance
with Rule 58 and/or 79 (a) FRCP on ___4|25|05___

35

indicating that modification of the scheduling order would be necessary. The Court referred the motion to U.S. Magistrate Judge S. Thomas Anderson, who held a status conference on February 8, 2005. As a result of that conference, an amended scheduling order was entered which, *inter alia*, set a deadline of March 10, 2005 for plaintiff to respond to the pending motion for summary judgment. On March 10, plaintiff filed a request for a one-day extension of time, which was granted. However, no response has ever been filed.

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. To prevail on a motion for summary judgment, the moving party has the burden of showing the "absence of a genuine issue of material fact as to an essential element of the nonmovant's case." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The moving party may support the motion with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The opposing party may not rest upon the pleadings but, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"If the defendant . . . moves for summary judgment . . . based on the lack of proof of a material fact, . . . [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The court's function is not to weigh the evidence, judge credibility, or in any way determine the truth

of the matter, however. <u>Anderson</u>, 477 U.S. at 249. Rather, "[t]he inquiry on a summary judgment motion . . . is . . . 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Street</u>, 886 F.2d at 1479 (quoting <u>Anderson</u>, 477 U.S. at 251-52). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970).

If a party does not respond to a motion for summary judgment, the Federal Rules of Civil Procedure provide that "summary judgment, if appropriate, shall be entered against him." Fed. R. Civ. P. 56(e). The fact that plaintiff did not respond does not require granting defendant's motion. However, if the allegations of the complaint are contravened by defendant's affidavits and defendant is entitled to judgment as a matter of law on those facts, then summary judgment is appropriate. <u>Smith v. Hudson</u>, 600 F.2d 60, 65 (6th Cir. 1979).

<u>Facts</u>

The defendant is in the business of manufacturing door products. The undisputed evidence in the record shows that plaintiff had been employed by the defendant at its facility in Gibson County, Tennessee, for over twenty years. During that time, plaintiff held various specific jobs within the manufacturing facility. At the time of his discharge in June 2002, plaintiff had held the job of machine operator B for approximately two years. That job involved using a crane to pull stock from racks and setting it up on a production line to be

cut, putting up stock with a crane or a forklift, and entering what he had done into a computer so there would be a record of what was manufactured. (Pl.'s Dep. at 46-47.)

On January 15, 2002, plaintiff's supervisor, Scott Gatlin, wrote plaintiff up after catching him allegedly sleeping on the job. Plaintiff denied that he had been sleeping, and told Gatlin that he was praying. He was shown the write-up, but refused to sign it. Id. at 69-70, 74-76. The write-up provides:

> Talked with Carl Flake today 1-15-2002 about making sure that at no time is
> he to be asleep. This means if his eyes are closed and he is not able to perform
> his duties he is sleeping. Carl has stated in the past that he prays, this notice
> is to make sure that everyone is on the same page and Carl understands that
> in the future when his eyes are closed and he is not on break he will be though
> [sic] of as sleeping and action will be taken up to discharge...

Id., Ex. 1.

On June 18, 2002, plaintiff testified that he was at his desk when he saw Gatlin standing next to him. Gatlin said something to plaintiff, and there was a brief exchange; Gatlin then walked away. Id. at 79-80. That afternoon, Gatlin told Janice McCartney, who was defendant's Human Resources Manager at the time, that he had caught plaintiff asleep again and asked her what could be done about it. There was no other witness to that particular incident. McCartney advised Gatlin that they should discuss it the next morning with Denny Ruetten, the vice president of manufacturing. (McCartney Aff. ¶ 3.)

The next day, June 19, 2002, Ruetten advised Gatlin to have plaintiff discharged, but McCartney placed plaintiff on suspension pending an investigation. She then spoke to various individuals, including Keith Ing, Richard Bailey and plaintiff's lead person, Ray

4

Bynum. Each of these three told McCartney that, while they did not observe the June 18 incident, they had seen plaintiff sleeping on work time after January 15, when he was first written up. Id. ¶¶ 4-5. In his deposition, plaintiff admitted it was possible that he fell asleep at his desk on work time after January 15. (Pl.'s Dep. at 78.) McCartney reported these findings back to Ruetten and they agreed that plaintiff should be discharged. (McCartney Aff. ¶ 6.)

After being suspended pending an investigation on June 19, plaintiff went home and told his wife what had happened. She told plaintiff that it could be true that he was sleeping at work, because he sometimes fell asleep that way at home; she advised him to go to a doctor. Plaintiff made an appointment with Dr. Renee Hendren for June 24, 2002. (Pl.'s Dep. at 86.) He had not yet been advised of the outcome of McCartney's investigation. Id. at 87.

At the appointment on June 24, Dr. Hendren did not diagnose plaintiff with any particular condition. Id. at 88. However, she did schedule plaintiff for a sleep study on September 17, 2002. On the paperwork plaintiff was given to take back to work with him, Dr. Hendren noted "possible sleep apnea." Id., Ex. 2. Plaintiff took the medical documentation back to work on June 24, immediately after his appointment, and left it with the receptionist in McCartney's office. Id. at 92-94.

That evening, McCartney called plaintiff at home and asked him to come and meet with her the next morning, June 25. Id. at 97. At that meeting, plaintiff was told that as a

result of McCartney's investigation, he was being discharged.  Plaintiff denied sleeping on the job, stating again that he was praying.  (McCartney Aff. ¶ 7.)  When plaintiff asked McCartney if she had seen the medical papers he left with the receptionist the day before, she told him she had not.  (Pl.'s Dep. at 100-01.)  He was given a separation notice stating that he was discharged effective June 25, 2002 for sleeping on the job.  Id., Ex. 4.  However, plaintiff was told that he could have his case reviewed by a peer review board if he wished, and he elected to do so.  Id. at 101.  After a hearing, the peer review committee could not reach a consensus on plaintiff's case.  Therefore, Ruetten sent plaintiff a letter dated July 23, 2002, advising him of the committee's failure to make a decision and stating that he, Ruetten, was upholding the termination.  Id. at 107-08 & Ex. 3.

Following the sleep study, Dr. Ron Taylor diagnosed plaintiff with restless leg syndrome, a condition that causes a person's legs to jerk and move involuntarily while they are sleeping, interrupting and/or preventing normal sleep.  Therefore, the person may experience excess sleepiness during the day.  Id. at 127-28.  However, plaintiff testified that, at the time of his discharge, he did not have any condition which affected his ability to do the job of machine operator B, and that he was fully able to perform that job without any limitations or restrictions.  Id. at 130-31.

<u>Americans with Disabilities Act</u>

The ADA prohibits an employer from discriminating against persons with disabilities.  Specifically, the Act provides:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).   A "qualified individual with a disability" within the meaning of this section is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In order to establish a claim of disability discrimination, plaintiff must prove that 1) he is an individual with a disability; 2) he is "otherwise qualified" to perform the essential functions of the job, with or without reasonable accommodation; and 3) he was either denied a reasonable accommodation or was subject to an adverse employment decision solely because of his disability.  See Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir. 1996); Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996); Maddox v. University of Tennessee, 62 F.3d 843, 846 (6th Cir. 1995).

Where, as here, there is no direct proof of discrimination in an ADA case, the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981) may be applied.  See Monette, 90 F.3d at 1184-86.  Under this analysis, a *prima facie* case of disability discrimination requires plaintiff to show that 1) he is disabled within the meaning of the ADA; 2) he was otherwise qualified for the position, with or without an

7

accommodation; 3) he suffered an adverse employment decision; and 4) the position remained open while the employer sought other applicants or the disabled person was replaced. <u>See</u> <u>Kocsis v. Multi-Care Management, Inc.</u>, 97 F.3d 876, 882 (6th Cir. 1996); <u>Monette</u>, 90 F.3d at 1185-86 & n.11; <u>Maddox</u>, 62 F.2d at 846.

Defendant argues that plaintiff cannot establish a *prima facie* case under the ADA because he cannot prove that he is disabled. The ADA defines "disability" as follows:

(A)   a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B)   a record of such impairment; or
(C)   being regarded as having such an impairment.

42 U.S.C. § 12012(2). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" is defined as the inability to perform, or a significant restriction on the ability to perform, a major life activity as compared to the average person in the general population. § 1630.2(j)(1). In determining whether a major life activity is substantially limited, the court must consider "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." § 1630.2(j)(2).

In this case, plaintiff has failed to offer any evidence that he suffers from an impairment that substantially limits a major life activity. Plaintiff apparently contends that

restless leg syndrome prevented him from getting a full night's sleep, and was thus causing

him to fall asleep during the work day:

> What it does, it wakes you up in the night and it keeps you from going, you
> know, after you fall asleep, this condition shaking your legs, makes you wake
> up and you don't realize that you wake up. It's sort of like say if you went to
> bed and you got, I think eight hours worth of sleep. In turn you usually get
> like three or four hours of sleep because you woke up in and out of the night
> and not realizing that you're waking and this will cause you to fall asleep
> during the day, during driving or something like that.

(Pl.'s Dep. at 127-28.) While sleeping is a major life activity, see Boerst v. General Mills

Operations, Inc., 25 Fed. Appx. 403, 406 (6th Cir. Jan. 15, 2002) (unpublished disposition),

the mere failure to get a full eight hours of sleep each night is not a substantial limitation on

that life activity. Id. at 407 ("Getting between two and four hours of sleep a night, while

inconvenient, simply lacks the kind of severity we require of an ailment before we will say

that the ailment qualifies as a substantial limitation under the ADA."); see also Cartwright

v. Lockheed Martin Util. Servs., Inc., 40 Fed. Appx. 147, 153 (6th Cir. July 3, 2002)

(unpublished disposition).

In order to establish a substantial limitation in the major life activity of working,

plaintiff must show that he is "significantly restricted in the ability to perform either a class

of jobs or a broad range of jobs in various classes as compared to the average person having

comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).  However, plaintiff

has failed to show that he was restricted at all in his ability to work. He testified plainly that,

at the time of his discharge, his condition did not affect his ability to do his job, without restrictions or limitations.  (Pl.'s Dep. at 130-31, 137.)

The Court concludes that plaintiff cannot establish a *prima facie* case of disability discrimination because he has failed to demonstrate that there are material facts in dispute on the issue of whether he is an "qualified individual with a disability."  Therefore, the defendant is entitled to judgment as a matter of law on plaintiff's ADA claim.

<u>Family and Medical Leave Act</u>

Pursuant to the FMLA, eligible employees are entitled to take up to a total of twelve weeks of leave per year under certain circumstances, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" provided by the statute, § 2615(a)(1), and may not "discharge or in any other manner discriminate against any individual for opposing any practice" that is unlawful under FMLA.  § 2615(a)(2). Claims under § 2615(a)(1) are referred to as "entitlement" or "interference" claims, while claims under § 2615(a)(2) are referred to as "retaliation" or "discrimination" claims.  <u>Arban v. West Publ'g Corp.</u>, 345 F.3d 390, 400-03 (6th Cir. 2003). The Court construes plaintiff's allegation that he was prevented from giving notice of his medical condition as a claim that the defendant interfered with his attempt to exercise his right to FMLA leave, in violation of § 2615(a)(1).

In order to establish a claim of interference with the exercise of the right to FMLA leave, a plaintiff must prove:  (1) that he was an eligible employee; (2) that the defendant was an employer within the meaning of the Act; (3) that he was entitled to leave under the Act; and (4) that the employer interfered with plaintiff's right to take leave or otherwise wrongfully denied the requested leave.  See Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206-07 (11th Cir. 1999); Jeremy v. Northwest Ohio Dev. Ctr., 33 F. Supp. 2d 635, 638 (N.D. Ohio 1999), aff'd, 2000 WL 353524 (6th Cir. Mar. 31, 2000).

The FMLA regulations provide that it is the employer's responsibility to designate leave as qualifying under the FMLA, and to notify the employee of that designation.  29 C.F.R. § 825.208(a).  However, the employee must give the employer sufficient notice and information to enable the employer to determine whether the leave is FMLA-qualifying. § 825.208(a)(1)-(2).  A "serious health condition" that would qualify for FMLA leave

> means an illness, injury, impairment, or physical or mental condition that involves—
> (A)    inpatient care in a hospital, hospice, or residential medical care facility; or
> (B)    continuing treatment by a health care provider.

29 U.S.C. § 2611(11).  The regulations further explain what is meant by a serious health condition involving continuous treatment by a health care provider:

> (2) .... A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
> (i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom) of more than

three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

....

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i).

Plaintiff alleges in the complaint that he was attempting to request FMLA-qualifying leave when he left the papers Dr. Hendren had given him with McCartney's receptionist on June 24, 2002, but was prevented from doing so. Plaintiff testified:

I told them that I have some medical papers up here that I want to return to them for and try to get some medical relief papers, medical papers up there. And what she told me was that she said leave them at the front desk.

(Pl.'s Dep. at 93-94.)   Plaintiff also testified that, during the June 25 meeting with McCartney, at which he was told he was being discharged:

Well, I asked her did she get the medical papers that I had left out there for me being off from work, you know, that I was off work, they were going to do a sleep study on me and she told me, no, I didn't see them.

Id. at 101.  This testimony fails to show that plaintiff made a request that was sufficiently specific to put McCartney on notice that he was requesting medical leave.

In any event, even if plaintiff's "request" for medical leave is deemed sufficient, the only information McCartney could have considered at the time of his discharge was the documentation showing that Dr. Hendren had scheduled a sleep study for plaintiff, on which she had noted "possible sleep apnea." Dr. Hendren made no actual diagnosis of any serious health condition at that time.  There is no evidence that she placed any restrictions on

plaintiff's activities, prescribed any specific treatment, or recommended that he be off work until the sleep study could be done. Furthermore, as indicated, plaintiff himself testified that at the time of his discharge he was fully able to perform his job, without limitations or restrictions. Id. at 130-31, 137.

Plaintiff has failed to offer any evidence to refute that submitted by the defendant. Consequently, the evidence is undisputed that plaintiff was not entitled to FMLA leave because he did not, at any time prior to his discharge, give notice of a serious health condition which made him unable to perform the functions of his position. Therefore, the defendant is also entitled to judgment as a matter of law of plaintiff's FMLA claim.

Conclusion

For the foregoing reasons, the defendant's motion for summary judgment is hereby GRANTED as to all of plaintiff's claims. The Clerk of Court is directed to prepare a judgment accordingly.

IT IS SO ORDERED.


_____
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

21 April 2005
_____
DATE

13

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 35 in case 1:03-CV-01240 was distributed by fax, mail, or direct printing on April 25, 2005 to the parties listed.

---

Amber Isom-Thompson
KIESEWETTER WISE KAPLAN SCHWIMMER & PRATHER, PLC
3725 Champion Hills Drive
Ste. 3000
Memphis, TN 38125

Bradley G. Kirk
CARTER STANFILL & KIRK
25 Natchez Trace Dr.
Lexington, TN 38351

John W. Simmons
KIESEWETTER WISE KAPLAN SCHWIMMER & PRATHER
3725 Champion Hills Dr.
Ste. 3000
Memphis, TN 38125

Honorable James Todd
US DISTRICT COURT